UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

------------------------------x

CLARIE A. BROWN,

             Plaintiff,

   -against-

THE BOARD OF TRUSTEES OF THE
BUILDING SERVICE 32B-J PENSION
FUND, THE BOARD OF TRUSTEES OF
THE BUILDING SERVICE 32B-J
HEALTH FUND, THE BUILDING
SERVICE 32B-J PENSION FUND, and
THE BUILDING SERVICE 32B-J
HEALTH FUND,

             Defendants.

------------------------------x

<u>MEMORANDUM</u>
<u>AND ORDER</u>
03-cv-3043 (DGT)

TRAGER, District Judge:

    Plaintiff Clarie Brown alleges that defendants Building

Service 32B-J Pension Fund ("Pension Fund"), the Board of

Trustees of the Building Service 32B-J Pension Fund, Building

Service 32B-J Health Fund ("Health Fund") and the Board of

Trustees of the Building Service 32B-J Health Fund (collectively,

"defendants") improperly denied him pension and disability

benefits in violation of the Employee Retirement Income Security

Act of 1974 ("ERISA"). <u>See</u> 29 U.S.C. § 1001, <u>et seq.</u> Mr. Brown

seeks to recover benefits for injuries he sustained when he

slipped and fell down some stairs while at work on May 1, 1997.

Defendants denied plaintiff's request for benefits, and affirmed

their decision upon appeal. Plaintiff filed suit on June 20,

2003, and both parties now move for summary judgment.

**Background**

Plaintiff is a 62-year-old maintenance worker and porter who last worked on May 1, 1997, when he fell down a flight of six stairs while mopping a stairway at work and struck the back of his head and neck on the bottom step.  Plaintiff experienced severe neck, lower back and leg pain as a result of the fall.

From approximately 1983 until 1997, plaintiff worked for employer members of the Health and Pension Funds, which are multi-employer benefit funds established pursuant to the Taft-Hartley Act, 29 U.S.C. § 186, and are each governed by an Agreement and Declaration of Trust ("plan").  Each Fund is administered by an equal number of management and union trustees. A Summary Plan Description ("SPD") describes the benefits provided by each Fund.

Under the terms of the Health Fund plan, an employee is considered totally disabled and, therefore, eligible for benefits, if "he is unable to perform work in any capacity." Aff. of Michael Geffner ("Geffner Aff."), ¶ 5.  The Health Fund SPD further provides that, "All determinations as to an applicant's disability are made in the sole and absolute discretion of the Trustees."  <u>Id.</u>  The Pension Fund plan likewise provides benefits for employees who are "totally and permanently disabled," a condition which is defined as being "unable, as a

result of bodily injury or disease to engage in any further employment or gainful pursuit." <u>Id.</u>, ¶ 8. The Pension Fund provides that

> The Trustees shall, subject to the requirements of the law, judge the standard of proof required in any case and the application and interpretation of this Plan, and decision of the Trustees shall be final and binding on all parties.

<u>Id.</u>, ¶ 9.

On or about February 4, 2000, plaintiff applied for a total disability pension under the Pension Fund and for a long-term disability benefit under the Health Fund. Plaintiff included a Physician's Statement of Disability with his application, which concluded that plaintiff was totally disabled from engaging in any occupation.

Pursuant to the terms of the SPDs, the Funds requested that plaintiff be examined at the Funds' expense by an independent physician, Dr. Michael Rubin. Dr. Rubin examined plaintiff on February 22, 2000, and reported his findings in a letter dated March 13, 2000 to the Health Fund medical advisor. Dr. Rubin stated that plaintiff "looks perfectly well, muscular and fit." He noted that "MRI of the lubarspine reports chronic changes of spondylosis. At L5-S1 there is a posterior disc in the midline. MRI of the cervical spine reports degenerative spondylosis with spinal stenosis at multiple levels, a midline disc at C4, 5 compressing the thecal sac." Dr. Rubin concluded that "[t]he

examination is unremarkable.  The MRI report do not [sic] justify disability.  This patient is not totally disabled.  Annual review is not necessary.  This patient may return to work."  Id., ¶ 15, Ex. K.

On March 22, 2000, the medical advisor of the Funds prepared a Total and Permanent Disability Certification Form, rejecting plaintiff's applications for both total and long-term disability benefits.  On April 10, 2000, Kevin Duffy, Director of the Health Fund, sent plaintiff a letter rejecting his application.  The letter states:

> Your application for Health & Pension Fund Benefits due Total/Permanent Disability, **is rejected.**
>
> Your medical condition when you last worked in covered employment; and the report of the independent disability evaluation on 2/22/00, does [sic] not qualify you under the Fund's Standard of Total Disability; defined: "**as a result of illness or injury, you are unable to perform work in any capacity.**"
>
> You, or your authorized representative is entitled to a review of the claim decision; upon written request. Specific information regarding the procedure to be followed for a review by the Board of Trustees is outlined below[.]

Geffner Aff. ¶ 16, Ex. N (emphasis in original).  The letter also informed plaintiff of his right to appeal the decision to the Board of Trustees.

On May 24, 2000, plaintiff's attorney submitted a letter to the Funds requesting copies of the SPDs; the Funds' latest annual reports; the trust indentures establishing the Funds and

plaintiff's health and medical records on file with the union,
including the report of Dr. Rubin.  Counsel also requested an
opportunity to confront and cross-examine the examining medical
consultant for the Funds with regard to plaintiff's eligibility
for total disability benefits.  Geffner Aff. ¶ 17, Ex. O.

On June 9, 2000, plaintiff, through his attorney, appealed
the rejection of his application, and submitted a packet of
medical records in support of his appeal.  The records purport to
show discogenic disease of the cervical and lumbosacral spine.
Id., ¶ 18, Ex. P.  The supporting medical records include a
February 19, 1998 letter from radiologist Dr. Mindy Pfeffer to
Dr. Agustin Sanchez, plaintiff's treating physician, regarding
Dr. Pfeffer's MRI of plaintiff's cervical spine, in which Dr.
Pfeffer noted:

1. Straightening of the normal cervical lordosis
   compatible with muscle spasm.
2. Chronic hypertrophic degenerative spondylosis of
   the cervical spine with spinal stenosis C2-3,
   C3-4, C5-6 and C6-7 disc levels, with the
   narrowing most pronounced at the C4-5 disc
   level.
3. Midline disc herniation at the C4-5 disc level
   causing compression of the thecal sac with
   osteophyte abutting the ventral surface of the
   cord in the midline.
4. Posterior midline osteophytes with chronic
   midline disc protrusion C2-3, C3-4 and C6-7 disc
   levels causing very [sic] degrees of compression
   along the anterior surface of the thecal sac.
5. Osteophyte formation seen along the anterior and
   right posterior disc margins C5-6 with
   degenerative bulging seen of the annulus of the
   disc.
6. Right neural foraminal narrowing C5-6 disc

level.

Id., ¶ 18, Ex. P.  Plaintiff also included a February 18, 2000

letter from Dr. Pfeffer to Dr. Sanchez describing an MRI of

plaintiff's lumbosacral spine, in which Dr. Pfeffer noted:

1.  There is spondylolysis with grade I anterior
    spondylolisthesis of the L5 vertebral body on
    S1.
2.  Chronic hypertrophic degenerative spondylosis
    L5-S1 with superimposed posterior disc
    herniation located in the midline extending
    along the right posterolateral disc margin at
    L5-S1.
3.  Disc desiccation of the T12-L1 disc with mild
    disc bulging of the annulus of the disc.
4.  Disc degeneration seen at the L4-5 disc.
5.  Degenerative changes at the zygapophyseal joints
    with hypertrophy of the ligamentum flavum
    causing central spinal stenosis.
6.  Minimal bulging of the annuli of the discs at
    L2-3, L3-4 and L4-5.

Id.  It is unclear from the record whether the MRIs conducted by

Dr. Pfeffer are the same MRI's referred to by Dr. Rubin in his

March 13, 2000 report.  In any event, based on the MRI reports

and physical examination of plaintiff, Dr. Sanchez concluded that

plaintiff is "totally disabled and unable to perform his regular

work duties."  Id., ¶ 18, Ex. P. (Letter from Dr. Sanchez to

Michael Barnas (plaintiff's counsel), dated June 8, 2000).

Also included in the June 9, 2000 appeal packet was a memo

dated February 29, 2000 from Dr. Robert B. Snow, a neurosurgeon,

who examined plaintiff and noted that the exam was "remarkable

for pain with back extension," and diagnosed him as having "L4/5

spinal stenosis."  Dr. Snow recommended "an MRI scan of his

6

lumbosacral spine and a probable L4/5 bilateral laminectomy."
Geffner Aff., ¶ 18, Ex. P.

The packet further included two letters from Dr. Richard W. Johnson to Dr. Sanchez, dated July 8 and 15, 1998. Dr. Johnson observed that plaintiff was in severe pain, and assessed that he was suffering from low back pain and sciatica. At a follow-up visit one week later, Dr. Johnson reviewed plaintiff's MRI of his cervical and lumbosacral spine and diagnosed "a significant herniated disc and a grade I spondylolisthesis at L5-S1, which causes significant spinal cord canal encroachment and lateral stenosis." Id., ¶ 18, Ex. P.

The Health Fund disability department acknowledged receipt of plaintiff's appeal packet by letter dated June 15, 2000. Id., ¶ 19, Ex. Q. However, by letter dated June 19, 2000, Mr. Duffy wrote that plaintiff's Disability Pension application had been denied by the Trustees. The letter stated:

> We received your Disability Pension application, and in accordance with the information submitted, and based upon Fund's records, we are sorry to inform you that your application has been denied by the Trustees for the following reason:
>
> In order to qualify for a Disability Pension under Article IV, Section 4.09, a participant must accumulate at least 120 months (ten full years), or more of service credit. Our records indicate that you have less than ten years of Vested service credit.
>
> Also, you do not qualify under the Plan definition of totally and permanently disabled: "unable as a result of bodily injury or disease to engage in any further

7

employment or gainful pursuit."

Id., ¶ 20, Ex. R. The letter further informed plaintiff of his right to appeal.

With respect to plaintiff's service credit eligibility for a disability pension, his employment from 1983 to 1997 was not continuous, although the record is unclear as to the number and length of breaks in his employment. Plaintiff has asserted in his brief and in his verified complaint that he has, in fact, accrued sufficient service credits to be eligible for the pension, and although defendants have denied this claim in their answer, they have not addressed the issue in their summary judgment briefs.

By letter dated June 23, 2000, plaintiff's counsel forwarded to the Health Fund a copy of a Physical Functional Capacity assessment by Dr. Sanchez for inclusion in the appeal packet sent on June 9, 2000. The (undated) assessment report indicates that plaintiff was capable of sitting for less than one hour, standing for two hours and walking for two hours, and that he could lift up to 10 lbs. Id., ¶ 21, Ex. S. Plaintiff's counsel also asked in the letter that the assessment be sent to Dr. Ruben Ingber, the physician chosen by the Fund to examine plaintiff in conjunction with his appeal, and further noted that he had still not received the documents he requested in his May 24, 2000 letter. Id., ¶ 21, Ex. S.

Pursuant to the Funds' request, plaintiff saw Dr. Ingber on June 28, 2000 in furtherance of his appeal. Dr. Ingber reviewed plaintiff's medical records and diagnosed him with bilateral sciatic neuritis/lumbar herniated disc. He concluded that plaintiff could work at a sedentary occupation, although he could not return to his prior work. Id., ¶ 24, Ex. V.

On September 18, 2000, the Funds' medical advisor prepared a memorandum addressed to the Appeals Committee of the Health Fund, stating that the application was again reviewed on September 12, 2000 and the rejection was upheld because plaintiff failed to meet the standard of "inability to perform work in any capacity, commencing on the date the disability was incurred." Id., ¶ 25, Ex. W. Plaintiff was informed of this decision in a letter from the Health Fund also dated September 18, 2000, which stated:

> Your appeal request for reconsideration of the rejection for Total/Permanent disability benefits from the Fund, is received with the supplemental medical reports/records; and [sic] included in your file.
>
> You were referred for an independent orthopedic disability evaluation on 6/28/2000, and the report with the entire file records were again extensively reviewed by the Medical Advisor for a claim decision.
>
> It is concluded that you were **not** Totally Disabled when you last worked in covered employment; as defined by the Fund, "**as a result of illness or injury, you are unable to perform work in any capacity, commencing on the date the disability was incurred,** and the **REJECTION OF YOUR APPLICATION IS UPHELD.**

<u>Id.</u>, ¶ 26, Ex. X (emphasis in original).

On October 17, 2000, plaintiff's counsel requested copies of the file on appeal and also provided additional documentation for the appeals committee's consideration, consisting of a medical report by Dr. Sanchez and thirteen pages of supporting lab workups. On that same day, the Health Fund acknowledged receipt of the additional documentation and confirmed that plaintiff had been provided copies of his file. <u>Id.</u>, ¶ 28, Ex. AA.

On October 25, 2000, plaintiff appeared before the Appeals Committee. The Committee noted in its report: "Plaintiff's doctor reports that neck and back injuries are totally disabling. His examination indicates that he is capable of sedentary work. There are also discrepancies in his records with regard to length of covered employment. The Committee recommends that the appeal be held in abeyance pending a reexamination by the Fund doctor." <u>Id.</u>, ¶ 29, Ex. BB.

Pursuant to this recommendation, plaintiff saw Dr. Peter Marchisello on December 21, 2000 at the Funds' request and expense. After reviewing plaintiff's medical history and performing a physical examination, Dr. Marchisello diagnosed plaintiff with

1) Based upon the MRI, spondylolisthesis 1st degree with spondylosis at L5.
2) Degenerative disc disease L4-5, L5-S1.
3) Cervical discogenic disease C2-C7.

Dr. Marchisello's prognosis was that the degenerative

changes in plaintiff's neck were irreversible and will persist indefinitely. He concluded that the spondylolisthesis also is an irreversible problem and can only be resolved with a spine fusion. He found no evidence of a radiculopathy. Dr. Marchisello summarized: "The disability in this claimant is moderate to severe, but not total in nature. It is however permanent and partial in magnitude." Id., ¶ 33, Ex. EE.

On January 31, 2001, the Health Fund informed plaintiff by letter that his appeal request for reconsideration had been denied, stating:

> Your appeal request for a reconsideration of the rejection for Total/Permanent disability benefits from the Fund, was considered at the Appeals Hearing on October 25, 2000 in your presence, and it was determined that a decision be held in abeyance, pending a further reevaluation.
>
> The report of the independent examination of 12/21/2000, your entire file records, and supplemental reports submitted with your appeal request, were again extensively considered by the Medical Advisor for a claim decision.
>
> It is concluded that you were **not** Totally Disabled when you last worked in covered employment; as defined by the Fund, "**as a result of illness or injury, you are unable to perform work in any capacity, commencing on the date the disability was incurred,**" and the **REJECTION OF YOUR APPLICATION IS UPHELD**.
>
> Your file will be submitted to the Appeals Committee for their consideration, and you will be notified under separate cover from that office.

Id., ¶ 34, Ex. GG (emphasis in original).

The Appeals Committee held a final hearing on December 13, 2001, at which counsel for the Funds noted that Dr. Marchisello reported that plaintiff was not totally and permanently disabled, and that the appeal was denied.  <u>Id.</u>, ¶ 36, Ex. II.

## Discussion

Defendants move for summary judgment on the grounds that the standard of review to be applied to the Trustees' decision to deny benefits is "arbitrary and capricious" and that plaintiff can prove no set of facts that would establish that the denial of benefits was, in fact, arbitrary and capricious.  Plaintiff cross-moves for summary judgment, arguing that the standard of review of denial of the disability pension is <u>de novo</u>, and further that the denial of benefits under both plans was arbitrary and capricious because the notice letters failed to give reasons for the denial, failed to consider the treating physicians' reports and failed to inform plaintiff of what additional information would be needed to overcome the decision. In addition, plaintiff has moved to strike several documents submitted in support of defendants' motion for summary judgment on hearsay and authenticity grounds, and defendants have moved to strike certain of plaintiff's submissions for failure to conform with the Local Rules.  For the reasons that follow, plaintiff's motion to strike is denied, defendants' motion to strike is

denied, defendants' motion for summary judgment is denied, and
plaintiff's motion for summary judgment is granted in part and
denied in part.


## (1)

### ERISA Standard of Review

Judicial review of a decision to deny ERISA benefits must be
de novo "unless the benefit plan gives the administrator or
fiduciary discretionary authority to determine eligibility for
benefits or to construe the terms of the plan." Firestone Tire &
Rubber Co. v. Bruch, 489 U.S. 101, 115 (1989); Kinstler v. First
Reliance Standard Life Ins. Co., 181 F.3d 243, 249 (2d Cir.
1999).  If the administrator does have such discretion under the
plan, a court may reverse the administrator's decision only if it
is arbitrary and capricious.  See Firestone Tire, 489 U.S. at
115; Zervos v. Verizon New York, Inc., 277 F.3d 635, 650 (2d Cir.
2002).  A decision is arbitrary and capricious "only if it was
without reason, unsupported by substantial evidence or erroneous
as a matter of law." Lekperic v. Building Service 32B-J Health
Fund, No. 02 CV 5726, 2004 WL 1638170, at *3 (E.D.N.Y. July 23,
2004) (quoting Pulvers v. First UNUM Life Ins. Co., 210 F.3d 89,
92 (2d Cir. 2000).

Plaintiff does not contest that the Trustees of the Health
Fund have discretion under the plan to determine benefit

eligibility, but argues that the plan language governing the Pension Fund does not confer sufficient discretion on the Trustees for their decision to escape <u>de novo</u> review. The plan language at issue reads

> The Trustees shall, subject to the requirements of the law, judge the standard of proof required in any case and the application and interpretation of this Plan, and decision of the Trustees shall be final and binding on all parties.

This is not the first time that a court has been called upon to determine whether this language grants the Trustees of the Pension Fund discretion such that their decisions may only be reviewed under an arbitrary and capricious standard. The courts that have addressed the question have unanimously found that the Pension Fund Trustees do have such discretion. <u>See, e.g.</u>, <u>Lekperic</u>, No. 02 CV 5726, 2004 WL 1638170, at *4 (E.D.N.Y. July 23, 2004)(Gleeson, J.); <u>Nerys v. Building Service 32B-J Health Fund</u>, No. 03 CV 0093, 2004 WL 2210256, at *5 (S.D.N.Y. Sept. 30, 2004)(Fox, M.J.); <u>Cejaj v. Building Service 32B-J Health Fund</u>, No. 02 CV 6141, 2004 WL 414834, at *7 (S.D.N.Y. Mar. 5, 2004)(Dolinger, M.J.). There is no reason to part company with the courts that have already interpreted the plan language. The plan is clear that the Trustees shall judge the application of the plan in particular cases and that their decision shall be binding. Accordingly, the arbitrary and capricious standard

applies.[1]

## (2)

## Decision to Deny Benefits

ERISA requires that an employee benefit plan shall

(1) provide adequate notice in writing to any participant or beneficiary whose claim for benefits under the plan has been denied, setting forth the specific reasons for such denial, written in a manner calculated to be understood by the participant, and

(2) afford a reasonable opportunity to any participant whose claim for benefits has been denied for a full and fair review by the appropriate named fiduciary of the decision denying the claim.

29 U.S.C. § 1133. The determination of what constitutes a "full

and fair review" depends upon the following criteria:

The plan's fiduciary must consider any and all pertinent information reasonably available to him.

---

[1] Plaintiff has also argued that a de novo standard should apply because the trustees were biased. He argues that the management trustees do not want to pay valid claims because doing so would increase the costs of funding the trusts, and that the union trustees are themselves covered employees, who are reluctant to reduce the pot available to themselves should they become disabled. Not only are these arguments completely unsupported; they are also misplaced. Any bias on the part of the Trustees would not change the standard of review, but would instead be considered in analyzing whether plaintiff's claim was afforded a full and fair review. See Firestone, 489 U.S. at 115 (noting that conflict of interest on the part of the fiduciary is one factor to be weighed in determining whether a decision was arbitrary and capricious); Jordan v. Retirement Comm. of Rensselaer Polytechnic Inst., 46 F.3d 1264, 1274 (2d Cir. 1995)(stating that mere fact that the fiduciary works for the employer that funds the plan does not alone create a conflict of interest).

> The decision must be supported by substantial
> evidence. The fiduciary must notify the participant
> promptly, in writing and in language likely to be
> understood by laymen, that the claim has been denied
> with the specific reasons therefor. The fiduciary
> must also inform the participant of what evidence he
> relied upon and provide him with an opportunity to
> examine that evidence and to submit written comments
> or rebuttal documentary evidence.

Crocco v. Xerox Corp., 956 F. Supp. 129, 139 (D. Conn.

1997)(quoting Grossmuller v. Int'l Union, United Auto. Aerospace

Agric. Implement Workers of Am., U.A.W., Local 813, 715 F.2d 853,

857-58 (3d Cir. 1983), rev'd on other grounds, 137 F.3d 105 (2d

Cir. 1998). A plan administrator is not required to give special

weight to the opinions of a claimant's treating physicians, but

neither is it permitted to arbitrarily refuse to credit a

claimant's reliable evidence. Black & Decker Disability Plan v.

Nord, 538 U.S. 822, 834 (2003).

Where, as here, a plan administrator provides only a

conclusory reason for rejecting a claim, e.g., because the

claimant did not meet the plan definition for disability, without

explaining why the claimant did not meet the plan definition for

disability, the administrator has not sufficiently grounded its

decision that a reviewing court could determine whether that

decision was arbitrary and capricious. This lack of explanation

in itself renders the decision arbitrary and capricious. See

Cejaj, 2004 WL 414834, at *8-9. In Cejaj, the Funds issued

rejection letters substantially identical to those at issue here.

The magistrate judge there found that "the Trustees may be within their rights to choose to adopt Dr. Rubin's medical opinion, but in conducting a 'full and fair review,' they must demonstrate that they considered the evidence from both sides and explain why they found one medical opinion more credible than other, directly conflicting opinions." Id., at *9. The court accordingly granted summary judgment for the plaintiff insofar as the defendant failed to provide him a "full and fair review." Id.

Likewise, the letters sent to plaintiff in this case fail to explain the Trustees' basis for concluding that plaintiff was not totally disabled. The first rejection letter from the Health Fund of April 10, 2000 does state that the rejection is based on the examination of February 22, 2000, but does not mention whether any other records were considered in reaching the rejection. The first rejection letter from the Pension Fund, dated June 19, 2000, similarly fails to elucidate the reasons for rejecting plaintiff's claim, even though, at that point, the Trustees were in possession of substantial evidence supporting plaintiff's claim, with the only countervailing evidence being Dr. Rubin's March 13, 2000 report regarding the February 22, 2000 examination.

During the course of plaintiff's appeals, the Funds arranged for him to see two more doctors, one of whom concluded that plaintiff could perform only sedentary work. The other doctor

concluded, rather cryptically, that plaintiff's disability was "moderate to severe, but not total in nature [and] permanent and partial in magnitude." Meanwhile, plaintiff submitted additional documentation of his disability from his treating physician, Dr. Sanchez. The rejection letters relating to the appeals specifically referred to the examinations by the doctors to whom the Funds had referred plaintiff, and additionally stated that the Medical Advisor had reviewed plaintiff's entire record, but still did not expound on why plaintiff's claims were being rejected.

Moreover, the conclusion that plaintiff could do sedentary work begs the question of what sedentary work he could hope to find. Plaintiff is in his early sixties, and has performed manual, unskilled labor for at least the past twenty-two years. See Cejaj, 2004 WL 414834, at *8 n.5. The plan definition of "totally disabled" – unable to perform work in any capacity – is silent as to whether the claimant's particular age, skills and education be considered. Clearly, an older, unskilled worker with little education and a disability has fewer employment options than a younger, skilled, educated worker with that same disability. Other, more generous, plans define disability as a condition which prevents a claimant from performing his or her usual occupation, or which renders a claimant incapable for perform any work for which he or she is or becomes qualified by

training, education or experience.  The plan at issue is not one
of those plans.  See Geffner Aff., ¶ 39.  However, a flat refusal
to consider a claimant's characteristics when determining whether
he is able to perform work in any capacity renders the plan's
promise of a disability pension hollow for all but the most
grievously incapacitated claimants.

The Eleventh Circuit addressed this issue in Helms v.
Monsanto Co., Inc., 728 F.3d 1416 (11th Cir. 1984), where it
reviewed a district court's affirmance of a plan's denial of
disability benefits to a worker who suffered from retinitis
pigmentosa, an incurable eye disease which leads to total
blindness.  The arbitrator of the claim in that case denied
benefits because he could not think of a disability "compatible
with conscious life" that would prevent a person from "engaging
in any occupation for remuneration or profit," the plan's
definition of total disability.  Id. at 1419.  The court reviewed
the interpretation of the total disability definition in light of
Congress's intent that "those who participate in the plans
actually receive the benefits they are entitled to and do not
lose these as a result of unduly restrictive provisions or lack
of sufficient funds," id. at 1420 (citing H.R. Rep. No. 93-807
(1974), reprinted in 1974 U.S.C.C.A.N. 4639, 4670, 4676-77),
explaining:

> Total disability under this type of provision is not
> considered to exist if the insured can follow any

19

> remunerative occupation, whether in his present
> vocation or another.  The phrase should not be given
> an absolute and literal interpretation.  It should
> not mean that the affected individual must be utterly
> helpless to be considered disabled.  It must be a
> relative term which means that the individual is
> unable to engage in a remunerative occupation or to
> do work in some profitable employment or enterprise.

Id. at 1420.  The court looked to insurance law and social

security cases for guidance on how best to interpret "total

disability," concluding that "we will not adopt a strict, literal

construction of such a provision which would deny benefits to the

disabled if he should engage in some minimal occupation, such as

selling peanuts or pencils, which would yield only a pittance."

Id. at 1421.  The Eleventh Circuit's reasoning is sound, and has

been adopted by the Tenth Circuit as well:

> We believe the policy concerns which underlie ERISA
> would be severely undermined if we endorsed a literal
> reading of the plan's terms.  Thus we join the
> reasoning of the Eleventh Circuit and hold that a
> reasonable interpretation of a claimant's entitlement
> to payments based on a claim of 'total disability'
> must consider the claimant's ability to pursue
> gainful employment in light of all the circumstances.

Torix v. Ball Corp., 862 F.2d 1428, 1431 (10th Cir. 1988).

A decision is arbitrary and capricious if it is "without

reason."  Lekperic, 2004 WL 1638170, at *3.  Here, the Trustees

did not give a reason for their conclusion that plaintiff was not

totally disabled.  Because the Trustees did not explain their

reasons for concluding that plaintiff is not totally disabled,

plaintiff was not afforded a "full and fair review" of his claim.

20

In addition, it is unclear whether the Trustees applied a literal and unduly restrictive construction of "total disability" in reaching their conclusion, failing to consider all of plaintiff's circumstances.

On the other hand, the evidence is not so overwhelmingly one-sided that a reasonable person could only conclude that plaintiff was totally disabled. The proper remedy in this situation is not for the court to substitute its judgment for that of the Trustees, but to remand the case back to the Trustees with the instruction that they reconsider plaintiff's application and comply with the requirements of 29 U.S.C. § 1133 in issuing their new decision. See Quinn v. Blue Cross and Blue Shield Ass'n, 161 F.3d 472, 477 (7th Cir. 1998); Cejaj, 2004 WL 414834, at *10.

## (3)

## Motions to Strike

Plaintiff has moved to strike large swaths of the administrative record – essentially, all documents not written by plaintiff's counsel or one of his treating physicians – on hearsay and authentication grounds. Plaintiff does not dispute that the documents he seeks to strike are what they appear to be, but rather contends that the affiant (defendants' counsel) submitting the documents is not in a position to vouch for their

authenticity or to testify that they are business records (or fall under some other exception to the hearsay rule). At the same time, plaintiff seeks to enter into evidence documents extrinsic to the administrative record, including plaintiff's social security file.

It is difficult to take plaintiff's argument seriously. The administrative review conducted by the Trustees in an ERISA case is not a trial, and the Trustees are not bound to follow the Federal Rules of Evidence. See, e.g., Karr v. National Asbestos Workers Pension Fund, 150 F.3d 812, 814 (7th Cir. 1998) ("A pension or welfare fund trustee or administrator is not a court. It is not bound by the rules of evidence."). It is beyond cavil that the Trustees are permitted to consider medical reports, which are hearsay. Indeed, if the Trustees could not consider medical reports, they would also have no basis in the paper record for concluding that a claimant was disabled.

A district court's review of a denial of an ERISA claim under the arbitrary and capricious standard is limited to the administrative record. Miller v. United Welfare Fund, 72 F.3d 1066, 1071 (2d Cir. 1995). Even where a plan administrator does not have discretion and a court reviews the plan's decision de novo, a court's review is restricted to the administrative record absent "good cause" to admit further evidence. See, e.g., Muller v. First Unum Life Ins. Co., 341 F.3d 119, 125-26 (2d Cir. 2003)

("When viewed in light of our standard that additional evidence should not be admitted without 'good cause' to expand the administrative record, the District Court's decision to exclude Muller's additional evidence was proper.") (internal citation omitted). Thus, in determining whether the Trustees' denial of benefits was arbitrary and capricious, it is proper to consider nothing more and nothing less than the administrative record. Because plaintiff's social security file was not part of the administrative record, it has not been considered for purposes of deciding the parties' cross-motions for summary judgment.

Defendants, meanwhile, have moved to strike plaintiff's Affirmation of Counsel on Motions for Summary Judgment because it is not based on personal knowledge and contains argument; plaintiff's Counter-Statement of Material Facts in Dispute for inclusion of argument and hearsay and failure to conform to the Local Rules; and plaintiff's Memorandum of Law for exceeding even the extended page limit granted by the court.

Regarding defendants' motion to strike, courts have broad discretion in applying their local rules. Plaintiff's memorandum of law does not exceed the page limit granted by the court, and there is no reason to strike it. Likewise, plaintiff's inclusion of argument in his affirmation and statement of material facts in dispute is not a sufficient reason to strike them. Accordingly, defendants' motion to strike is denied.

## Attorneys' Fees

Lastly, plaintiff has requested an award of attorneys' fees. The factors to be considered in deciding an application for attorneys' fees in an ERISA case under 29 U.S.C. § 1132(g)(1) are "(1) the degree of the offending party's culpability or bad faith, (2) the ability of the offending party to satisfy an award of attorney's fees, (3) whether an award of fees would deter other persons from acting similarly under like circumstances, (4) the relative merits of the parties' positions, and (5) whether the action conferred a common benefit on a group of pension plan participants." Chambless v. Masters, Mates & Pilots Pension Plan, 815 F.2d 869, 871 (2d Cir. 1987).

Plaintiff argues that the first factor is met, because defendants are culpable for failing to adhere to the requirement of ERISA to conduct a full and fair review. Defendants have not responded to plaintiff's application for attorneys' fees, so their views on the subject are not known. Defendants' culpability in this case rests on their failure to explain the reasons for rejecting plaintiff's claim in the rejection letters, and does not rise to the level of demonstrating bad faith. Nonetheless, bad faith is not required, and a finding of culpability follows from a violation of ERISA. See Locher v. Unum Life Ins. Co. of Am., 389 F.3d 288, 299 (2d Cir. 2004);

Salovaara v. Eckert, 222 F.3d 19, 28 (2d Cir. 2000).  Therefore, the first factor is met.

Plaintiff contends that the second factor – ability to pay – is met, based on defendants' retention of three doctors to examine plaintiff and multiple lawyers to litigate this case.  As noted above, defendants do not dispute their ability to pay, so this factor also is met.

With respect to the third factor, plaintiff argues that an award of attorneys' fees would deter defendants from repeating their failure to give reasons for a denial of benefits in future cases.  The deterrent effect referred to in the third factor is directed to third parties, not defendants in this case, but it could be expected that an award of attorneys' fees in this case would discourage other plan administrators from issuing similarly conclusory rejection letters.  Thus, the third factor also is met.

The fourth factor – the merits of the parties' positions – weighs in favor of defendants.  Defendants advanced a simple proposition in their brief – that the decision of the Trustees should be reviewed under the arbitrary and capricious standard, and that plaintiff had not adduced evidence that the denial of benefits was arbitrary and capricious.  Defendants did not respond to plaintiff's substantive arguments regarding the deficiencies of the notice letters, but focused instead on the

evidentiary disputes.  Defendants did not advance a frivolous position, and the Trustees' decision to deny benefits has not been shown to be in bad faith.  Accordingly, this factor is not met.  See, e.g., Lauder v. First UNUM Life Ins. Co., 284 F.3d 375, 383 (2d Cir. 2002).

The fifth factor is not at issue here, because plaintiff brings this case on his own behalf only.  The Second Circuit has determined that findings of ability to pay are neutral.  Id.

In sum, the factors do not overwhelmingly favor one side over the other, and therefore an award of attorneys' fees is not warranted.

## Conclusion

For the reasons stated, defendants' motion for summary judgment is denied and plaintiff's cross-motion for summary judgment is granted in part and denied in part. Both parties' motions to strike are denied. The case is remanded to the Building Service 32B-J Health Fund and Pension Fund for reconsideration in accordance with ERISA and this opinion. The Clerk of the Court is directed to close the case.

Dated: Brooklyn, New York
       September 29, 2005

                                   SO ORDERED:


                                   __/s/_____
                                   David G. Trager
                                   United States District Judge